UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VERNON McFARLAND,

        Plaintiff,                          Case No. 05-70549

v.                                      Hon. Gerald E. Rosen

BOB SAKS TOYOTA, INC.,
TRANS UNION LLC,
POLICE OFFICER BRAGG, and
POLICE OFFICER RZEPPA,

        Defendants.
_____/

OPINION AND ORDER REGARDING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    November 7, 2006   

PRESENT:  Honorable Gerald E. Rosen
United States District Judge

## I. INTRODUCTION

Plaintiff Vernon McFarland commenced this suit in this Court on February 10,

2005, asserting a variety of federal and state-law claims arising from the June 16, 2004

repossession of a vehicle that Plaintiff had purchased four days earlier from an

automobile dealership operated by Defendant Bob Saks Toyota, Inc.  The claims against

Defendants Bob Saks Toyota and Trans Union LLC subsequently were dismissed by

stipulation of the parties, leaving Farmington Hills Police Officers David Bragg and Scott

Rzeppa as the sole remaining defendants.[1]  As to these two Defendant police officers, Plaintiff has asserted federal constitutional claims under 42 U.S.C. § 1983 and claims of impermissible use of a credit report in violation of the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*

Through the present motion, the Defendant police officers seek dismissal of the claims against them or summary judgment in their favor.  In support of this motion, Defendants argue that they did not violate Plaintiff's rights under the Fourth or Fourteenth Amendments to the U.S. Constitution because any seizure of Plaintiff or his property was effected by the Bob Saks auto dealership, with the Defendant officers merely present on the scene to investigate allegations of criminal wrongdoing. Defendants further contend that they cannot be held liable under the FCRA because they neither saw nor used Plaintiff's credit report during their investigation of criminal activity.

This motion has now been fully briefed by the parties, with Plaintiff having filed a response in opposition to the motion and Defendants having filed a reply in further support of their motion.  Having reviewed the parties' briefs and accompanying exhibits, as well as the record as a whole, the Court finds that the relevant allegations, facts, and legal arguments are adequately presented in the written record, and that oral argument would not aid the decisional process.  Accordingly, the Court will decide Defendants'

---

[1]Because these police officers are the only remaining defendants, the Court refers to them as "Defendants" throughout the remainder of this opinion and order.

2

motion "on the briefs." See Local Rule 7.1(e)(2), U.S. District Court, Eastern District of

Michigan.  This opinion and order sets forth the Court's rulings on this motion.

## II.  FACTUAL BACKGROUND

For present purposes, most of the relevant facts are disclosed in Plaintiff's

deposition testimony, which the Court views in a light most favorable to Plaintiff as the

non-moving party.[2]  On Saturday, June 12, 2004, Plaintiff visited the Bob Saks Toyota

automobile dealership in Farmington Hills, Michigan, seeking to purchase a newer

vehicle to replace his 1992 Plymouth Acclaim.  Plaintiff selected this particular

dealership because it had advertised a "bad credit, no credit" sale, and he was seeking to

reestablish his credit after he had filed for bankruptcy.

After meeting with a salesperson and completing a credit application, Plaintiff was

told that he would qualify for a financed purchase of either of two vehicles.  Upon

inspecting these two cars, he selected a 2004 used Dodge Intrepid.  Plaintiff then executed

various documents to carry out this transaction, including a buyer's order, a retail

installment sale contract, an application for title, and an agreement to provide insurance.

At the conclusion of this transaction, Plaintiff left his 1992 Acclaim with the dealer as a

trade-in and drove away in the 2004 Intrepid.

Before leaving the dealership that day, Plaintiff asked for a second key to the 2004

Intrepid that he could give to his wife.  The salesperson, in turn, asked whether Plaintiff

---

[2]As discussed below, this elementary principle of summary judgment law largely dictates
the proper resolution of Defendants' motion.

could provide a title for the 1992 Acclaim, which he had not brought with him that day. It was agreed that Plaintiff would return to the dealership within the next few days to provide the title and pick up a second key.

About two days later, Plaintiff received a call from the Bob Saks salesperson inquiring about the title for the 1992 Acclaim. Plaintiff was able to locate this title, and called the dealership to arrange to bring it in on the morning of Wednesday, June 16, 2004.

After dropping his wife off at work on the morning of June 16, Plaintiff arrived at the Bob Saks dealership at around 9:30 a.m. and parked his 2004 Intrepid in the dealership lot. Plaintiff was left in a waiting area for about an hour, and then was met by a dealership employee, Andrew Cline, who led him into an office. Unbeknownst to Plaintiff, Cline had contacted the Farmington Hills police while he sat in the waiting area, advising the police (i) that a customer on the premises had attempted to purchase a vehicle under a false name, (ii) that the customer was unaware that the police had been notified, and (iii) that the customer's car had been blocked in so that it could not be moved. In response to this call, the Defendant police officers, David Bragg and Scott Rzeppa, were dispatched to the dealership.

After being escorted into an office at the dealership, Plaintiff met briefly with Cline and an unidentified general manager, who informed him that he was suspected of committing identity fraud in light of two different Social Security numbers that had appeared in his credit paperwork. Plaintiff responded that only one of the two numbers

4

was correct, and he sought to confirm this by producing a Social Security card. At this point, however, Officers Bragg and Rzeppa came into the office and began their inquiry, with the two dealership employees leaving the office shortly thereafter and allowing the Defendant officers to "run the show." (Plaintiff's Response, Ex. 1, Plaintiff's Dep. at 138.)

According to Plaintiff, Defendant Bragg explained that the dealer suspected him of "some kind of identity theft." (Id. at 81.) Officer Bragg then told Plaintiff that he "just want[ed] me to admit to the identity theft and I can leave." (Id.) Officer Bragg further explained "that this was a federal situation and it really didn't have anything to do with him," and that "we just want you to admit that you did commit identity fraud." (Id. at 81, 94.) In response, Plaintiff asked if he was under arrest, and Officer Bragg stated that he was not. Nonetheless, when Plaintiff asked whether he could leave or could call his wife, the officer responded that he could not.

Over the next twenty or twenty-five minutes, the Defendant officers reviewed Plaintiff's credit paperwork and asked him a variety of questions about his credit history. When Plaintiff was shown a copy of his credit report at his deposition, he opined that the Defendant officers had this report in their possession and referred to it in the course of their questioning. (See id. at 88.)[3] At one point during this process, the officers asked

_____

[3]As discussed below, the Defendant officers dispute Plaintiff's testimony on this point. In particular, Officer Bragg testified that Plaintiff was not asked about his credit history and that he did not review Plaintiff's credit report. (See Defendants' Reply Br., Ex. 1, Bragg Dep. at 46.)

5

Plaintiff to explain why certain credit transactions reflected in this report were listed under a different Social Security number.  In response, Plaintiff confirmed that he had engaged in the transactions in question, but stated that he could not explain why they were associated with a different Social Security number.  Rather, he told the officers that he had used only one Social Security number throughout his lifetime, and could not account for the reference to another number in his credit report.

During the course of the officers' investigation, they sought and received Plaintiff's permission to search the 2004 Intrepid.  After conducting their search, the officers resumed their questioning of Plaintiff regarding the information in his credit report.  At one point, Officer Bragg noted that the credit score associated with Plaintiff's correct Social Security number was high, and he suggested that Plaintiff had applied for credit under a false Social Security number as a means to keep his credit record clear. Plaintiff responded that his credit record was, in fact, rather poor following his bankruptcy, and that he had sought to finance the purchase of the 2004 Intrepid in an effort to rebuild his credit.  Plaintiff was unable to account for, and remains unable to this day to explain, the reference to a second Social Security number in his credit report.

After a few more minutes of this questioning, Plaintiff was instructed to call his wife on the telephone and then hand the phone to the officers, evidently so that they could check whether the Social Security number listed on Plaintiff's credit application was correct.  Officer Rzeppa stepped out of the room to speak to Plaintiff's wife, and stated upon returning to the room that she had confirmed the Social Security number listed on

6

the application. While Officer Rzeppa was out of the room, Officer Bragg, who is African-American, purportedly told Plaintiff that "I hope you come up guilty of something so we can haul your black ass to jail." (Id. at 102.)

A short time later, the Defendant officers concluded their questioning and left the office. They returned a few minutes later, informing Plaintiff that the dealership wished to "renege[] on the deal," take back the 2004 Intrepid, and allow Plaintiff to leave with his former vehicle, the 1992 Acclaim. (Id. at 103.) Officer Bragg directed Plaintiff to collect his belongings from the 2004 Intrepid, kept the key to this vehicle that Plaintiff had given him when the officer had requested permission to search the vehicle, and gave Plaintiff the key to the 1992 Acclaim. Plaintiff transferred his belongings from the 2004 Intrepid to the 1992 Acclaim and drove away. In all, Plaintiff was at the dealership for about two hours that morning, and he did not speak with any dealership employee after the two Defendant police officers arrived and began their investigation.[4]

Based on this incident, Plaintiff commenced the present suit against Bob Saks Toyota, the Trans Union credit reporting agency, and the two Defendant police officers, asserting a variety of federal claims under the Truth In Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.,* the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.,* the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.,* and 42 U.S.C. § 1983,

---

[4]Again, the testimony of the Defendant officers differs from Plaintiff's testimony on this point. Officer Bragg testified that he did not oversee the process of Plaintiff returning the Intrepid and taking back the Acclaim, and that he did not know who asked or instructed Plaintiff to make this switch. (See Bragg Dep. at 39-40.)

7

as well as several state-law claims. Following the stipulated dismissal of Plaintiff's

claims against Bob Saks Toyota and Trans Union, Plaintiff continues to pursue his claims

against the Defendant officers under § 1983 and the FCRA, alleging that the officers

violated his rights under the Fourth and Fourteenth Amendments to the U.S. Constitution

and that they misused his credit report in violation of the FCRA.

## III.  ANALYSIS

### A.     The Standards Governing Defendants' Motion

Through the present motion, Defendants seek summary judgment in their favor on

Plaintiff's claims under 42 U.S.C. § 1983 and the FCRA.[5]  Under the pertinent Federal

Rule, summary judgment is proper "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there

is no genuine issue as to any material fact and that the moving party is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(c).

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof

might affect the outcome of the suit under the governing substantive law."  Reeves v.

Swift Transportation Co., 446 F.3d 637, 640 (6th Cir. 2006).  "A dispute over a material

fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for

_____

[5]Although Defendants' initial motion also sought dismissal of these claims under Fed. R. Civ. P. 12(b)(6), this motion was filed before Defendants had an opportunity to take Plaintiff's deposition. In their subsequent submissions in support of and opposition to Defendants' motion, the parties have supported their various arguments by citation to Plaintiff's deposition and other materials in the record, and the Court likewise has referred to these materials in addressing these arguments. Accordingly, it is clear that Defendants' motion must be "treated as one for summary judgment and disposed of as provided in Rule 56." Fed. R. Civ. P. 12(b).

8

the nonmoving party." <u>Reeves</u>, 446 F.3d at 640 (internal quotation marks and citation omitted).  In its review of the record to determine whether there is such a "genuine issue as to any material fact," this Court "may not determine the credibility of witnesses or weigh evidence."  446 F.3d at 640.  Rather, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  446 F.3d at 640 (internal quotation marks and citations omitted).  With these standards in mind, the Court turns to the present motion.

**B.** **The Defendant Officers Are Not Entitled to Qualified Immunity on Plaintiff's § 1983 Claim of a Fourth Amendment Violation Through the Seizure of His Vehicle.**

As the first of his two theories of recovery against the Defendant police officers, Plaintiff alleges that Officers Bragg and Rzeppa actively participated in the violation of his Fourth Amendment protection against unreasonable searches and seizures by detaining and questioning him and then repossessing his vehicle without a proper legal basis.[6]  Through the present motion, however, Defendants argue that they committed no such Fourth Amendment violation, where they purportedly had a legitimate basis for questioning Plaintiff about suspected criminal activity, and where they deny that they participated in the decision by the Bob Saks dealership to cancel its transaction with Plaintiff.  Alternatively, Defendants contend that qualified immunity shields them against

_____

[6]Plaintiff's complaint also alludes to possible Fourteenth Amendment claims of substantive and procedural due process violations.  (<u>See</u> Complaint at ¶ 118(c), (d).)  His response to Defendants' motion, however, relies entirely on the Fourth Amendment as the basis for his § 1983 claims against the Defendant officers.  Accordingly, the Court finds that any substantive or procedural due process claims have been abandoned.

liability for any Fourth Amendment violation that might have been committed.  The Court

finds, however, that each of these arguments rests upon portions of the record that remain

in genuine dispute, thereby precluding an award of summary judgment in Defendants'

favor.

Under well-established principles, this Court's qualified immunity inquiry entails

two questions:

> First, the court must determine whether, based upon the applicable
> law, the facts viewed in the light most favorable to the plaintiff[] show that
> a constitutional violation has occurred.  If the court finds a constitutional
> violation, it must then consider whether the violation involves clearly
> established constitutional rights of which a reasonable person would have
> known.

Burchett v. Kiefer, 310 F.3d 937, 942 (6th Cir. 2002) (internal quotations and citations

omitted).  Accordingly, the Court first considers whether the record, viewed in a light

most favorable to Plaintiff, establishes a violation of his Fourth Amendment rights.

In an effort to establish such a violation, Plaintiff focuses principally, if not

exclusively, on the Fourth Amendment protection against unreasonable seizures of

personal property.  As Plaintiff observes, the Supreme Court's decision in Soldal v. Cook

County, 506 U.S. 56, 113 S. Ct. 538 (1992), while distinguishable in certain respects,

provides considerable guidance on this point.  In that case, a trailer park owner brought

state court eviction proceedings against the petitioners, Edward Soldal and his family,

who resided in a trailer home within this park.  Rather than awaiting a judgment in its

favor, however, the park owner chose to forcibly remove the Soldals and their trailer

10

home from the park, and it "requested the presence of sheriff deputies to forestall any possible resistance" to this effort.  <u>Soldal</u>, 506 U.S. at 58, 113 S. Ct. at 541.  For purposes of resolving the issues presented for its resolution, the Supreme Court assumed that the "deputy sheriffs knew that [the trailer park owner] did not have an eviction order and that its actions were unlawful," and further assumed that the deputies were not merely passive observers, but instead had "themselves seized the trailer, disconnected it from the utilities, and towed it away."  506 U.S. at 59-60 & nn. 4, 6, 113 S. Ct. at 542-43 & nn. 4, 6.

Under these circumstances, the Supreme Court rejected the privacy-based analytical approach employed by the Court of Appeals, and instead concluded that the Soldals had alleged a "seizure" of their property within the meaning of the Fourth Amendment.  Indeed, the Court observed that "the Soldals' domicile was not only seized, it literally was carried away, giving new meaning to the term 'mobile home.'"  506 U.S. at 61, 113 S. Ct. at 543.  While there remained the question "[w]hether the [Fourth] Amendment was in fact violated," a "question that requires determining if the seizure was reasonable," the Court rejected any notion that "being unceremoniously dispossessed of one's home in the manner alleged to have occurred here can be viewed as anything but a seizure invoking the protection of the Fourth Amendment."  506 U.S. at 61-62, 113 S. Ct. at 543.

In so ruling, the Court addressed the concern that it was unwisely expanding the reach of the Fourth Amendment "into territory unknown and unforeseen:  routine repossessions . . . and the like, thereby federalizing areas of the law traditionally the

11

concern of the States."  506 U.S. at 71, 113 S. Ct. at 548.  In finding this risk

"exaggerated," the Court first observed that repossessions often would implicate the

Fourth Amendment even under the Court of Appeals' narrow privacy-based

understanding of this constitutional guarantee, so long as the repossession of property

"involve[d] entry into the home" or otherwise "intru[ded] upon individuals' privacy."

506 U.S. at 71, 113 S. Ct. at 548.   The Court then continued:

> More significantly, reasonableness is still the ultimate standard under
> the Fourth Amendment, which means that numerous seizures of this type
> will survive constitutional scrutiny.  As is true in other circumstances, the
> reasonableness determination will reflect a careful balancing of
> governmental and private interests.  Assuming, for example, that the
> officers were acting pursuant to a court order, . . . as often would be the
> case, a showing of unreasonableness on these facts would be a laborious
> task indeed.  Hence, while there is no guarantee against the filing of
> frivolous suits, had the ejection in this case properly awaited the state
> court's judgment it is quite unlikely that the federal court would have been
> bothered with a § 1983 action alleging a Fourth Amendment violation.
>
> Moreover, we doubt that the police will often choose to further an
> enterprise knowing that it is contrary to the law, ***or proceed to seize
> property in the absence of objectively reasonable grounds for doing so.***  In
> short, our reaffirmation of Fourth Amendment principles today should not
> foment a wave of new litigation in the federal courts.

506 U.S. at 71-72, 113 S. Ct. at  548-49 (emphasis added) (internal quotation marks and

citations omitted).

This Court views the <u>Soldal</u> decision as providing a useful analytical framework

for the issues presented in this case.  In particular, if it could be said here (i) that the Bob

Saks dealership lacked a lawful basis for dispossessing Plaintiff of the 2004 Dodge

Intrepid that he had purchased four days earlier, and (ii) that the Defendant police officers

12

actively participated in this repossession effort, then the ruling in <u>Soldal</u> presumably

would dictate the conclusion that Plaintiff's vehicle was "seized" within the meaning of

the Fourth Amendment.  While this would still leave the question whether this seizure

could nonetheless be deemed "reasonable," Defendants do not address this issue in their

motion, but instead argue, in effect, that the two above-cited factual predicates to the

<u>Soldal</u> decision are lacking here as a matter of law.[7]

The Court cannot agree.  Turning first to the issue of the auto dealership's

entitlement to repossess the vehicle on June 16, 2004, Plaintiff contends in his response to

Defendants' motion that he secured lawful possession of the 2004 Dodge Intrepid four

days earlier, on June 12, 2004, when he completed all of the necessary paperwork and

took delivery of this vehicle.  As Plaintiff points out, this claim of a possessory interest

finds support in a provision of the Michigan Motor Vehicle Code, which states in relevant

part:

> Upon the delivery of a motor vehicle and the transfer, sale, or
> assignment of the title or interest in a motor vehicle by a person, including a
> dealer, the effective date of the transfer of title or interest in the vehicle
> shall be the date of execution of either the application for title or the
> assignment of the certificate of title.

Mich. Comp. Laws § 257.233(9); <u>see also</u> Michigan Secretary of State Dealer Manual, §

3-3.3 (attached as Ex. 10 to Plaintiff's Response) (providing that the interest in a vehicle

---

[7]This is a somewhat charitable reading of Defendants' effort to distinguish <u>Soldal</u>.  After
providing a one-sentence summary of that case and quoting a single sentence from the Supreme
Court's ruling, Defendants pronounce in conclusory fashion that "[t]here is no analogous
evidence in this case."  (Defendants' Reply Br. at 7.)

is transferred from a dealer to a purchaser upon the latter signing the application for title and taking delivery of the vehicle). The record reflects that Plaintiff signed the application for title on June 12, 2004, (see Plaintiff's Response, Ex. 4), and it is undisputed that he took delivery of the 2004 Intrepid that same day. All of this suffices to raise an issue of fact, at least, as to whether Plaintiff was in lawful possession of this vehicle when he returned to the auto dealership on June 16, 2004.

Defendants' cursory discussion on this point fails to persuade the Court that the dealer was entitled to rescind the June 12 transaction and repossess the vehicle upon Plaintiff's arrival at the dealership four days later. In Defendants' view, Plaintiff did not truly "purchase" the 2004 Intrepid on June 12 because his request for financing purportedly remained pending and was subsequently "rejected by the Bank." (Defendants' Reply Br. at 10.) As an initial matter, this argument rests upon a factual premise that is unsupported in the record, where there is no evidence, apart from Officer Bragg's hearsay account of what he was told by Bob Saks employee Andrew Cline, (see Bragg Dep. at 35), that any bank denied a request to finance Plaintiff's purchase of the Intrepid. See U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1189 (6th Cir. 1997) (explaining that inadmissible hearsay "must be disregarded" in deciding a summary judgment motion).

In any event, Defendants have notably failed to identify any authority for their assertion that a failed financing arrangement would have left Plaintiff without any "property interest in the vehicle." (Defendants' Reply Br. at 10.) Certainly, the above-

14

cited Michigan Motor Vehicle Code provision is to the contrary.  In addition, Plaintiff points to his execution of a retail installment sale contract on June 12, 2004, under which he agreed to buy and Bob Saks Toyota agreed to sell the vehicle in question.  (See Plaintiff's Response, Ex. 3, Retail Installment Sale Contract.)  Nothing in this agreement reflects that the sale of the vehicle was contingent upon the satisfaction of outstanding conditions, whether as to financing or otherwise.  To the contrary, this agreement evidently authorized the repossession of the vehicle only upon Plaintiff's "default under this contract," (id. at 3, ¶ 10), and it is not readily apparent from a review of the contract's provisions that a failure of financing would constitute such a "default."[8]  Accordingly, Defendants have fallen considerably short of establishing as a matter of law that the Bob Saks dealership had a legal basis for its June 16, 2004 repossession of a vehicle it had sold to Plaintiff four days earlier.

Nonetheless, Defendants insist that the second predicate to the application of Soldal is lacking here, where there purportedly is no evidence that they "took an active role" in the repossession of the Intrepid.  (Defendants' Reply Br. at 8.)  As both sides

---

[8]Moreover, certain materials placed into the record by Plaintiff suggest that a dealer would violate Michigan law if it engaged in the practice of "spot delivery" that Defendants posit as having occurred in this case.  In particular, Plaintiff has produced a 1989 opinion letter from the Michigan Department of Commerce, Financial Institutions' Bureau, stating the Bureau's opinion that a motor vehicle sales contract conditioned upon the seller's ability to assign the contract to a financial institution would violate Michigan law.  (See Plaintiff's Response, Ex. 9, 5/22/1989 Opinion Letter; see also Plaintiff's Response, Ex. 10, Michigan Secretary of State Dealer Manual, § 3-3.4 (also opining that "[i]t is a violation of state law to attempt 'repossession' of a vehicle after delivery or to change the terms of a finance contract if a finance company refuses the contract after a spot delivery").)

agree, a private party's repossession of personal property does not become "state action" within the scope of § 1983 merely by virtue of a police officer's "presence at the site" for the purpose of "observ[ing] and monitor[ing]" the repossession.  Haverstick Enterprises, Inc. v. Financial Federal Credit, Inc., 32 F.3d 989, 995 (6th Cir. 1994); see also Marcus v. McCollum, 394 F.3d 813, 818 (10th Cir. 2004) (noting that "officers are not state actors during a private repossession if they act only to keep the peace").  In contrast, "[w]hen an officer begins to take a more active hand in the repossession, and as such involvement becomes increasingly critical, a point may be reached at which police assistance at the scene of a private repossession may cause the repossession to take on the character of state action."  Barrett v. Harwood, 189 F.3d 297, 302 (2d Cir. 1999); see also United States v. Coleman, 628 F.2d 961, 964 & n.1 (6th Cir. 1980) (distinguishing between the "benign attendance" of the police at the scene of a repossession and acts of "compulsion," "encourage[ment]," or other forms of "affirmative participation").

Under this governing law, upon which the parties are in agreement, and under the record produced by the parties, the Court cannot see how it could possibly conclude as a matter of law that the Defendant officers were not actively involved in the repossession of Plaintiff's vehicle, but instead played only a peacekeeping role.  Under Plaintiff's version of the events surrounding the repossession of his car, the Defendant officers completely **took over** the process of repossession upon their arrival at the Bob Saks dealership, to the point that Plaintiff no longer interacted **at all** with **any** dealership employees between the time that the officers began their inquiry and the time he drove away in his old car, the

16

1992 Acclaim.  During this period, the officers *alone* questioned Plaintiff about his alleged use of a false Social Security number in his credit paperwork; they *alone* took possession of his key to the 2004 Intrepid; they *alone* informed Plaintiff of the dealership's decision that it wished to rescind its sale of the 2004 Intrepid; and they *alone* implemented the dealership's decision by retaining the key for the 2004 Intrepid that Plaintiff had given them, handing him the key to the 1992 Acclaim, and instructing him to clear his possessions out of the 2004 Intrepid.

In stark contrast to this evidence of the Defendant officers' active involvement in the repossession of Plaintiff's vehicle, the record notably lacks *any* testimony, even by the officers themselves, that the police were summoned to the dealership premises for the sole, or even primary, purpose of maintaining the peace, or that they were, in fact, ever called upon to perform this function in the course of the repossession.  Officer Bragg characterized his role in this case as investigating the allegations of fraud made by the dealership and determining whether a crime had been committed, and he testified that he concluded his inquiry and left the scene upon determining that no crime had been committed.  (See Bragg Dep. at 55-56, 82-83.)  More generally, Officer Bragg testified that the entire incident was "a very easygoing situation."  (Id. at 60.)  To be sure, the police are entitled — and, indeed, expected — to investigate allegations of criminal wrongdoing.[9]  Yet, to do so in a way that actively and affirmatively assists in a private

---

[9]As Defendants observed in their initial brief in support of their summary judgment motion, they were entitled to briefly detain and question Plaintiff so long as they had a

17

repossession — as opposed to merely monitoring and diffusing a potentially volatile situation — runs the risk of establishing a "'curbside courtroom,' in which officers decide who [i]s entitled to possession" of disputed property.  <u>Marcus</u>, 394 F.3d at 820 (internal quotation marks and citation omitted).  Regardless of whether the outcome of such a process might prove justified in a subsequent Fourth Amendment "reasonableness" inquiry — where, for example, it turns out that the party whose property is repossessed lacks any sort of valid interest in the property in question — there can be no doubt that the participation of the police in such a process qualifies as "state action" within the reach of § 1983.

In the end, the various arguments advanced in Defendants' motion — and particularly in their reply brief, filed after they had an opportunity to take Plaintiff's deposition — rest upon the proposition that the Court should disregard Plaintiff's account of the June 16, 2004 repossession, and should instead accept the Defendant officers' version of the events of that day.  Indeed, Defendants do not even acknowledge Plaintiff's

---

reasonable suspicion of criminal activity.  <u>See</u> <u>Terry v. Ohio</u>, 392 U.S. 1, 88 S. Ct. 1868 (1968); <u>United States v. Butler</u>, 223 F.3d 368, 374 (6th Cir. 2000).  In his complaint, however, Plaintiff alleged that the Defendant officers unlawfully detained him without "even articulable suspicion to believe that he committed a crime."  (Complaint at ¶ 118(a).)  This allegation seemingly formed the basis for a separate Fourth Amendment claim of unreasonable seizure of Plaintiff's person, as opposed to the allegedly unreasonable seizure of property that is addressed in the body of this opinion.

For whatever reason, however, Plaintiff has focused only on the latter in his response to Defendants' motion, and has made no effort to identify evidence in support of a claim that the Defendant officers unlawfully detained him without reasonable suspicion.  Accordingly, it appears that Defendants' claim of a lawful <u>Terry</u> detention is unopposed, and that Plaintiff has abandoned his Fourth Amendment claim of an unreasonable seizure of his person.

18

testimony in their reply brief, stating at various points that Plaintiff has "failed to come forward with evidence" on matters that he did, in fact, ***specifically address*** at his deposition.  (See, e.g., Defendants' Reply Br. at 2, 8, 9.)  Much as Defendants might prefer that the Court not consider Plaintiff's testimony as to events in which he was personally involved, well-established summary judgment principles preclude this course of action.  Upon reviewing the entirety of the record as required under Rule 56, the Court readily concludes that genuine issues of material fact remain as to both (i) the Bob Saks dealership's lawful entitlement to repossess Plaintiff's vehicle, and (ii) the extent of the Defendant officers' involvement in this repossession.  These outstanding issues of fact preclude a determination as a matter of law that the Defendant officers did not transgress Plaintiff's Fourth Amendment protection against the unlawful seizure of his property.

It remains only to ask whether this possible Fourth Amendment violation "involve[d] clearly established constitutional rights of which a reasonable person would have known." Burchett, supra, 310 F.3d at 942.  In the Court's view, the above-cited case law dictates an affirmative answer to this question.  First, the Supreme Court's ruling in Soldal clearly established the principle that the police commit a "seizure" within the meaning of the Fourth Amendment when they dispossess an individual of his property in aid of a private party's repossession effort.  Next, the Sixth Circuit's decisions in Haverstick Enterprises and Coleman, along with a host of rulings from other circuits, recognize the legally significant distinction between the mere presence of the police at a private repossession and their active participation in this effort.  As these are the decisions

19

that define the contours of the constitutional violation alleged by Plaintiff in this case, and as all of these decisions predate the incident at issue here, the Court cannot say as a matter of law that the conduct of the Defendant officers was objectively reasonable, such that they are entitled to qualified immunity.

## C.   Issues of Fact Remain as to the Defendant Officers' Possible Violation of the FCRA.

The second theory of recovery advanced by Plaintiff against the Defendant officers rests upon the FCRA prohibition against the use of a credit report "for any purpose" unless, among other things, the report was obtained for a use deemed permissible under the statute. 15 U.S.C. § 1681b(f). In seeking summary judgment in their favor on this FCRA claim, Defendants argue (i) that they did not "pull" a credit report but, at most, merely reviewed a report that allegedly was included among the collection of documents provided to them by the auto dealership, and (ii) that, according to their testimony, they did not "use" any credit report during their questioning of Plaintiff. As discussed below, the first of these contentions lacks a legal basis, and the second is defeated by Plaintiff's testimony to the contrary.

In support of his FCRA claim, Plaintiff cites a provision of this Act stating that "[a] person shall not use or obtain a consumer report for any purpose unless . . . (1) the consumer report is obtained for a purpose for which the consumer report is authorized to be furnished under this section; and (2) the purpose is certified in accordance with section 1681e of this title by a prospective user of the report through a general or specific

20

certification."  15 U.S.C. § 1681b(f).[10]  This same provision further states that a

"consumer reporting agency may furnish a consumer report" under certain enumerated

circumstances "and no other," with this list of permissible circumstances including (i)

"[i]n response to the order of a court," (ii) [i]n accordance with the written instructions of

the consumer," (iii) use "in connection with a credit transaction involving the consumer,"

and (iv) "[i]n response to a request by the head of a State or local child support

enforcement agency" in connection with child support or paternity matters.  15 U.S.C. §

1681b(a).[11]

Based on this statutory language, the courts have found that a plaintiff must

establish three elements in order to sustain a claim of improper use or acquisition of a

credit report:  (i) that there was a "consumer report" within the meaning of the statute; (ii)

that the defendant used or obtained it; and (iii) that the defendant did so without a

permissible statutory purpose.  See Phillips v. Grendahl, 312 F.3d 357, 364 (8th Cir.

---

[10]All are agreed that the credit report that allegedly was given to the Defendant police officers in this case qualifies as a "consumer report" within the meaning of the FCRA.  See 15 U.S.C. § 1681a(d) (defining the term "consumer report").

[11]Elsewhere, the Act provides for the limited disclosure of certain information to the FBI in connection with "authorized investigation[s] to protect against international terrorism or clandestine intelligence activities."  15 U.S.C. § 1681u(a), (b).  This statutory authorization does not encompass credit reports, however, unless the FBI separately secures a court order directing a consumer reporting agency to make such a disclosure.  15 U.S.C. § 1681u(c).  The Act also permits credit reports to be furnished "to a government agency authorized to conduct investigations of, or intelligence or counterintelligence activities or analysis related to, international terrorism," but only upon the agency's "written certification . . . that such information is necessary for the agency's conduct o[f] such investigation, activity or analysis."  15 U.S.C. § 1681v(a).

2002); Gillom v. Ralph Thayer Automotive Livonia, Inc., 444 F. Supp.2d 763, 771 (E.D.

Mich. 2006).  In addition, the plaintiff must demonstrate that the defendant acted with the

requisite degree of culpability — either negligence, 15 U.S.C. § 1681o(a), or willfulness,

15 U.S.C. § 1681n(a) — in order to impose civil liability under the FCRA.  See Phillips,

312 F.3d at 364; Gillom, 444 F. Supp.2d at 771.

Against this legal backdrop, the Court turns to the two specific arguments

advanced in Defendants' motion.  First, Defendants place significance on the fact that

Plaintiff's credit report was provided to them upon their arrival at the Bob Saks

dealership, and that they did not make any affirmative effort to "pull" or otherwise obtain

this credit report.  And, it is true that "[m]ere passive receipt" of a credit report, without

more, would not be sufficient to establish that a defendant "used or obtained" such a

report.  Phillips, 312 F.3d at 364.  Yet, because the statute prohibits *either* "obtain[ing]"

*or* "us[ing]" a credit report without a permissible purpose, it is not dispositive that a

defendant did not make any affirmative effort to obtain a credit report that he

subsequently uses.  There simply is no statutory requirement that the defendant himself

must have pulled the report that he is accused of misusing.

Nonetheless, Defendants point to their own testimony that they did not review

Plaintiff's credit report, and they contend that, under this record, they cannot be found to

have "used" this report during their questioning of Plaintiff.  Once again, however, this

argument disregards Plaintiff's express testimony to the contrary, in which he (i) stated

that the Defendant officers "were going over my credit report" during their questioning of

22

him, (Plaintiff's Dep. at 83-84), and (ii) identified a particular credit report in the record

as the one that the officers used and referred to during this questioning, (id. at 88).

Consequently, this issue cannot be decided in Defendants' favor on a motion for summary

judgment, but must await resolution by the trier of fact.[12]

─────────────────────

[12]Regarding the final element of Plaintiff's FCRA claim — namely, that the Defendant officers must have used his credit report without a permissible statutory purpose — Defendants offer only the most conclusory of arguments in their initial brief in support of their motion, stating that "[t]here is simply no provision under the Fair Credit Reporting Act which prohibits a law enforcement officer from reviewing a consumer or credit report provided to them by a reported victim of criminal activity concerning a criminal suspect." (Defendants' Motion, Br. in Support at 15.)  Yet, as Plaintiff points out in response, and as is evident from the above-quoted language of the FCRA itself, the statute does not operate in this proscriptive fashion, but instead enumerates the ***permissible*** purposes for which a credit report may be obtained.  Notably, the statute lacks any provision that could be construed as granting a broad license for law enforcement officers to obtain credit reports in aid of criminal investigations; rather, it much more narrowly permits such reports to be obtained during authorized investigations relating to intelligence or counterintelligence activities or international terrorism.

When confronted by Plaintiff's argument that the statute lacks any sort of blanket permission for law enforcement officers to obtain credit reports, Defendants have not endeavored to address this subject any further in their reply brief, but instead have pursued only the two contentions addressed in the body of this opinion — namely, that they themselves did not obtain Plaintiff's credit report, and that they did not review any such report in the course of their investigation.  Given Defendants' perfunctory treatment of this issue, the Court need not address the potentially difficult question whether a credit report that is initially obtained for a permissible purpose — as Plaintiff's credit report presumably was here, in light of his request to finance his vehicle purchase — may then be used by law enforcement officers to investigate suspected fraud or other criminal conduct in the course of the underlying credit transaction.

23

## IV.  <u>CONCLUSION</u>

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's motion to

dismiss or for summary judgment is DENIED.

s/Gerald E. Rosen
Gerald E. Rosen
United States District Judge

Dated:  November 7, 2006

I hereby certify that a copy of the foregoing document was served upon counsel of record
on November 7, 2006, by electronic and/or ordinary mail.

s/LaShawn R. Saulsberry
Case Manager
